**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00296-CR**
**NO. 09-23-00297-CR**
_____

**NNAMDI IKENNA ENEREMADU, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the County Court at Law No. 4**
**Montgomery County, Texas**
**Trial Cause Nos. 23-373909 and 23-373910**

_____

**MEMORANDUM OPINION**

Appellant Nnamdi Ikenna Eneremadu appeals his conviction in trial cause number 23-373909 for failure to identify to a peace officer and his conviction in trial cause number 23-373910 for criminal trespass. In Appellant's sole issue on appeal in each case, he argues that the trial court abused its discretion in denying Appellant's request to reopen the evidence after he and the State had rested their

cases but before closing arguments and before the jury was charged. We overrule Appellant's sole issue and affirm.

## Background

In cause number 23-373909, Eneremadu was charged by information with failure to identify himself to a peace officer, a class C misdemeanor.[1] *See* Tex. Penal Code Ann. § 38.02(a), (c)(1). In cause number 23-373910, Eneremadu was charged by information for criminal trespass, a class B misdemeanor. *See* Tex. Penal Code Ann. § 30.05(a), (d)(1). The cases were tried together. In each case, Eneremadu pleaded "not guilty", and the jury found him guilty. In trial cause number 23-373909, the jury assessed a $500 fine. In cause number 23-373910, the jury assessed punishment at thirty days of confinement in county jail (but recommended suspension of the confinement and that he be placed on community supervision), and the jury assessed a $1,000 fine. The trial court ordered Eneremadu to pay a $500 fine in cause number 23-373909, and in cause number 23-373910 the trial court suspended the 30-day jail sentence and placed him on community supervision for eighteen months. Eneremadu timely filed this appeal.

---

[1] According to the State, the offense was initially believed to be a class B misdemeanor under section 38.02(d) because of an outstanding class C misdemeanor warrant for Appellant's arrest at the time of the offense, but, due to a lack of any allegation of fugitive status in the complaint and information, the State agreed at trial to treat the offense in Cause No. 23-373909 as a class C misdemeanor.

Evidence at Trial

Testimony of a Resident of the Oak Haven Apartments

A resident of the Oak Haven Apartments testified that the residents at the property are "[m]ostly retired people[]" and that most of the residents are over seventy years old. According to the resident, the property is private, is gated and "totally fenced in[,]" has several no trespassing signs displayed, and has only one way in or out. She testified that each resident has a "fob" to open the entrance gate, and at the gate a visitor can gain access to the property by typing the apartment number of the resident they are visiting into a box, the resident can then press a key on their phone, and then the gate opens for the visitor.

The resident testified that on February 20, 2023, she and two other women had been walking on the property inside the gates and they stopped to talk when they saw a stranger, whom she agreed at trial was the defendant, walking towards them. After they confirmed that none of them knew the man that was approaching them, they asked him if he was lost or who he was there to see. Eneremadu did not identify any resident in the complex that he knew, and he told the women that he "was spreading the word of God." She and others told Eneremadu multiple times that he was on private property and needed to leave because he was trespassing, but Eneremadu would not leave, and the police were called. According to the resident, Eneremadu told the women that his car was there, but he did not remember where

he parked it, and the resident testified that she did not remember him ever mentioning that he was there to help someone move into the complex. The resident testified that although she was not scared of Eneremadu, he was making statements about whether the women were Christians and went to church and the women were trying to convince him to leave. The resident testified that when the police arrived, she voiced to them her concerns about Eneremadu being on private property. According to the resident, when she and the other women saw the police arrive, the women told Eneremadu that the police were there, and he quickly walked away from them. The resident testified that she was later informed that Eneremadu had been knocking on doors at the complex. The resident identified photographs of the entrance and exit gates of the property, photographs of the point where visitors can gain access by dialing a resident's number were admitted into evidence, and photographs of several no trespassing signs on the property, and the photographs were admitted into evidence.

Testimony of Officer Eric Bauer

Officer Eric Bauer with the Shenandoah Police Department testified that around 6:30 p.m. on February 20, 2023, he was on duty and dispatched to the Oak Haven apartment complex regarding a suspicious person in the gated community. According to Officer Bauer, the typical residents there are "55-plus[]" years old, most residents are in their seventies or early eighties, and the complex is a fully-

4

gated community with single-story apartments. Officer Bauer testified that there are four unobstructed no trespassing signs on the exterior of the complex and consent is required to access the community. Officer Bauer testified that there is only one functioning gate where there is an entrance and an exit, and there is an access box there and a no trespassing sign on the main entrance gate.

According to Officer Bauer, when he arrived at the complex in his patrol car, the gate was closed, and a code had to be entered to access the complex. Once inside, Officer Bauer looked for the suspicious individual that was described as a younger "black male, blue shirt, and black pants[]" who was reportedly walking around the complex and going up to different apartments, knocking on doors, and asking to speak with residents inside, and also approaching people in the parking lot to speak with them. After driving into the back half of the complex, Officer Bauer eventually located a man matching the description who was walking towards an apartment. At trial, Officer Bauer identified the defendant as the man he found at the complex. Officer Bauer testified that he radioed to his partners that he had located the subject and was going to exit the vehicle and talk to him. As Officer Bauer approached Eneremadu and started asking him "something to the effect of, hey, man what's going on tonight[,]" Eneremadu turned around and looked at Bauer, and Bauer continued approaching in attempt to find out what Eneremadu was doing and start a

5

conversation with him. Officer Bauer was in uniform and believed it was clear to Eneremadu that he was a police officer.

Officer Bauer testified that Eneremadu initially said he was on the premises to talk about religion and God. Bauer testified he told Eneremadu he needed to leave the property, but Eneremadu did not leave. According to Officer Bauer, for almost thirty minutes he and Eneremadu talked about many topics including religion and what "private property means," and Bauer asked him numerous times for his name, date of birth, and whether he had a driver's license or identification card. Officer Bauer testified that he explained to Eneremadu that because it was a "55-plus only" community and for public safety and officer safety he needed to know who was walking around the community. Bauer testified that Eneremadu clearly understood English and what Bauer was asking, but Eneremadu told Bauer he did not want to provide that information to Bauer because if Bauer "r[a]n [Eneremadu's] information []something may pop up." Officer Bauer testified that, based on his more than ten years in law enforcement, that comment made him believe that Eneremadu may have an active warrant. Two other officers arrived on the scene and those officers also each explained to Eneremadu that he was trespassing and that he needed to provide identifying information. According to Officer Bauer, Eneremadu later in the conversation stated he was on the premises looking for a location because he was going to help someone move, but Eneremadu could not provide the name of

the person he was supposed to be helping move nor could he explain whether he had permission to be on the property, and he could only provide the name of a dispatcher and not a moving company. Bauer testified that Eneremadu may have said the name of the dispatcher was "Bob." Later in the conversation, Eneremadu changed his story and stated he was instead actually visiting someone on the property, but he was unable to provide that person's name. Officer Bauer testified that he and the other two officers continued to explain to Eneremadu that if he did not provide his identifying information that he would be charged not only with criminal trespass but also with failure to identify. At one point, Eneremadu tried to negotiate with Bauer and asked him that if he provided Bauer his identifying information would Bauer promise to let him go. Officer Bauer testified that after Eneremadu was arrested for criminal trespass, he was detained in the back of Bauer's patrol vehicle, and Eneremadu continued to refuse to provide his identifying information after being asked by Bauer for an additional eight to ten minutes. Officer Bauer then called Sergeant Hilado to the scene for Hilado's automated fingerprint identifying scanner (AFIS) device which could identify Eneremadu with a fingerprint scan. After Hilado arrived and scanned Eneremadu's fingerprint, the officers were able to identify Eneremadu through a photograph and a Texas driver's license number that dispatch was able to run to confirm Eneremadu's identity. Officer Bauer transported

7

Eneremadu to the jail where he was booked for charges of criminal trespass and failure to identify.

Video recordings from Officer Bauer's body cam and dash cam depicting Eneremadu's interaction with law enforcement were admitted into evidence and portions of those exhibits were played for the jury.

Testimony of Sergeant Joshua Hilado

Sergeant Joshua Hilado with the Montgomery County Sheriff's Office testified that he was called to the scene to use his AFIS device to identify a subject. Hilado showed the device to the jury, explained how it operates, and testified that the device is tied into the state's fingerprint database. According to Sergeant Hilado, at the scene he used the AFIS device to identify the subject as Eneremadu, and he identified the defendant at trial as Eneremadu.

Eneremadu's Testimony

After the State and defense rested but prior to closing arguments and the reading of the charges, the defense moved to reopen the evidence and the trial court reopened the evidence because Eneremadu wanted to testify. Eneremadu testified that he is a U.S. citizen, was born in west Africa, and immigrated to the United States. According to Eneremadu, he does different odd jobs, including moving, remodeling, and tutoring. Eneremadu testified that in the past he has worked for the moving companies Coleman American and New World Van Lines.

Eneremadu testified that in the present case, "Mr. Robert" texted him an address at the complex to assist in a moving job. According to Eneremadu, "Mr. Robert" is either a mover, a dispatcher, or a driver and "a mover or maybe a contractor or somebody in the moving industry." Eneremadu testified he did not know the name of the business that solicited him to assist with the move, he did not know the last name of "Mr. Robert," nor the name of the company for which "Mr. Robert" works. According to Eneremadu, he had never met "Mr. Robert" but Eneremadu testified he is usually hired for moves through a cell number from which he gets an address for the job. Eneremadu testified that, "I have provided [Mr. Robert's] cell phone number. And I have shown the text evidence." Eneremadu testified that when he got to the complex, he did not see a security guard at the gate or inside the complex, he followed a car through the gate when the gate opened for that car, and he met several people inside the complex before the police arrived an hour or two later. Eneremadu testified that he did not remember seeing any no trespassing signs at any of the complex's gates. According to Eneremadu, "Mr. Robert" never showed up at the premises and Eneremadu was never paid for the job. Eneremadu testified that he had the unit number for the move but not the resident's name, and that he told the officers that the job must have been cancelled. Eneremadu testified that although the job had apparently been canceled and no one in the complex gave him permission to be there, he did not have to leave once the job was

9

canceled because he had met people there that day. According to Eneremadu, none of the residents at the complex that he talked to that day asked him to leave, and the resident that testified that she asked him multiple times to leave had lied. Eneremadu testified that when the officers asked him for his identifying information, he said, "I don't have it[,]" and that when they asked him for his last name, he responded that it was private information. Eneremadu agreed he remembered attempting to negotiate with the officers that he would provide his last name if they let him leave, and that the reason he did not provide the officers his identifying information was because he did not know what would come up when the officers ran his information. According to Eneremadu, he ultimately provided the officers his first and last name before he was handcuffed. Eneremadu testified that he did not remember if any of the officers told him that he had a class C warrant out of Pasadena, and he denied that he did not want to provide his identifying information because he had the warrant out of Pasadena.

Issue on Appeal

In Appellant's sole issue on appeal in each case, he argues that the trial court abused its discretion in denying Appellant's request to reopen the evidence a second time after he and the State had rested their cases but before closing arguments and before the jury was charged. Specifically, Appellant argues that he was denied a fair trial when the trial court denied Appellant's motion to reopen evidence for a second

10

time. According to Appellant, evidence of the text messages he received that directed him to the property "were essential to [his] line of defense[] in that he believed he had permission to be on the premises[,]" the evidence was not cumulative because the earlier testimony was "extremely limited in that regard[,]" and if the evidence had been admitted it would have "gone to the weight or credibility of other evidence."

## Standard of Review

We review a trial court's denial of a request to reopen the evidence under an abuse of discretion standard. *Pond v. State*, No. 09-09-00483-CR, 2011 Tex. App. LEXIS 4505, at *34 (Tex. App.—Beaumont June 15, 2011, pet. ref'd) (mem. op., not designated for publication); *Reeves v. State*, 113 S.W.3d 791, 794 (Tex. App.—Dallas 2003, no pet.) (citing *Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003)); *see also* Tex. Code Crim. Proc. Ann. art. 36.02. A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *see also State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005).

Analysis

Article 36.02 provides that a court "shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to [the] due administration of justice." Tex. Code Crim. Proc. Ann. art. 36.02. "'[D]ue administration of justice' means a judge should reopen the case if the evidence would materially change the case in the proponent's favor." *Peek*, 106 S.W.3d at 79; *Reeves*, 113 S.W.3d at 794. Under the "due administration of justice" requirement, the evidence must be more than relevant, and it must actually make a difference in the case. *See Peek*, 106 S.W.3d at 78-79. And the evidence cannot be cumulative. *Taylor v. State*, No. 09-17-00023-CR, 2018 Tex. App. LEXIS 5654, at *6 (Tex. App.—Beaumont July 25, 2018, no pet.) (mem. op., not designated for publication); *Birkholz v. State*, 278 S.W.3d 463, 464 (Tex. App.—San Antonio 2009, no pet.) (citing *Peek*, 106 S.W.3d at 79).

In the present case, after the trial court had already allowed the defense to reopen the case once, both sides rested for the second time. The parties and the judge were discussing the jury charge prior to closing arguments, and the defense then moved to reopen the evidence a second time to allow Eneremadu to testify again because he wanted to further explain why he was at the complex. The State argued that there was no good cause to reopen the evidence and that "there was testimony several times of why [Eneremadu] believed he was there [a]nd there was plenty of

12

opportunity yesterday, while the defendant was on the stand, to get out any and all evidence that they wanted to present." After the trial court consulted legal authority, the trial court informed the parties of some of the cases the trial court found instructive, and the following exchange occurred:

> THE COURT: . . . All of these [cases] dealt with reopening evidence at some point, either at punishment phase or at guilt/innocence where at the close of evidence but prior to reading the jury charge, there was a request to reopen the evidence to call a witness. And it appears that it is at the discretion of the trial court[.] [T]he Code of Criminal Procedure does require a trial court to allow testimony to be introduced at any time before the argument of a cause is concluded if it appears that it is necessary to the due administration of justice under Article 36.02.
>
> The proffered evidence is necessary to the due administration of justice if it would materially change the case in the proponent's favor. . . .
>
> In other words, the evidence must be more than just relevant. It must actually make a difference in the case. Evidence that is merely cumulative of other evidence does not meet this standard.
>
> . . . .
>
> I would like to hear from defense counsel the proffered testimony in specificity that would not be cumulative from yesterday.
>
> . . . .
>
> So, what additional testimony do you plan to elicit today that requires you to recall your client?
>
> [Defense counsel]: That there were communications between him and Mr. Robert. But, again, those communications are not clear. We don't have any specific order as to what time he was to be there.
>
> THE COURT: And are you able to elicit more detail about those communications if you were to call your client?
>
> . . . .
>
> [Defense counsel]: There's no evidence that those text messages didn't take place and what my client did or the results of it.

THE COURT: But, . . . , none of that is new for this jury. This was all brought out yesterday. And your client had ample opportunity to tell the jury about it and did and was cross-examined about it and - -

[Defense counsel]: There was discussion. Clearly there was.

THE COURT: . . . the case law that I'm - - that I'm moving under here, and that I'm reading, requires that the testimony your client give this morning not be cumulative, that it not be the same as what he would already had testified to yesterday. And everything, you've said it yourself, is it would be the same as yesterday.

[Defense counsel]: It would be a reaffirmance of yesterday's testimony with regard to the communications. And that's why he was there, in anticipation of working that day to move.

THE COURT: But a reaffirmance means that he would simply be saying the same thing that he testified to yesterday and that's not good cause to reopen evidence, [defense counsel].

[Defense counsel]: That is essentially correct.

THE COURT: Okay. So, with that, then I do find that it is not a good reason for me to reopen evidence for a second time in this case. Reopening the evidence for the first time in this case, I certainly did not hesitate because your client had not had the opportunity to testify. And when you advised him that it would be a good idea, he took your advice. And I allowed you to reopen the evidence. And he testified and was able to give the information that he did yesterday to the jury which allowed you to move forward with your trial theory that you've had from the very beginning, which is the mistake of fact as to how he came to be on that property. . . .

So, [defense counsel], you've been very consistent with your trial theory throughout this case. And your client was able to do that yesterday. Me allowing him to - - or you to reopen the evidence. But today, me allowing you to reopen for a second time, by your very assertions, there is nothing new that he would be testifying to.

So, at this time, I will not be allowing that based on the case law that I've cited, based on the proffered testimony, the four-prong test

14

that I have reviewed, and the Code of Criminal Procedure that guides me in this. I will be denying that request.

Here, defense counsel represented to the trial court that if the evidence was reopened a second time, Eneremadu's testimony would not include any new information and would essentially be a "reaffirmance of" previous testimony. We conclude on this record, that the trial court's denial of Eneremadu's request to reopen the evidence for the second time was not an abuse of discretion. The trial court reasonably could have concluded the evidence Eneremadu wanted to present was cumulative and it would not make a material difference in the case. The trial court's ruling was not outside the zone of reasonable disagreement. *See Peek*, 106 S.W.3d at 79; *Taylor*, 2018 Tex. App. LEXIS 5654, at *6; *Birkholz*, 278 S.W.3d at 464; *see also De La Paz*, 279 S.W.3d at 343-44; *Montgomery*, 810 S.W.2d at 391. We overrule Appellant's issue in both cases on appeal and affirm the trial court's judgments.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on July 22, 2024
Opinion Delivered July 31, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.

15